**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SUSAN GUINUP,**

                                   **Plaintiff,**


                **v.**                                          **5:08-CV-1110**
                                                                  **(FJS/GHL)**

**PETR-ALL PETROLEUM CORPORATION,**
**doing business as EXPRESS MART, and**
**PETR-ALL PETROLEUM CONSULTING**
**CORPORATION,**

                                   **Defendants.**
_____

**APPEARANCES**                          **OF COUNSEL**

**BLAU, BROWN & LEONARD, LLC**           **STEVEN BENNETT BLAU, ESQ.**
54 West 21st Street                      **SHELLY A. LEONARD, ESQ.**
Suite 1009
New York, New York 10010
Attorneys for Plaintiff

**HINMAN, HOWARD & KATTELL, LLP**        **LESLIE PRECHTL GUY, ESQ.**
700 Security Mutual Building
80 Exchange Street
P.O. Box 5250
Binghamton, New York 13902-5250
Attorneys for Defendants

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    On October 15, 2008, Plaintiff brought this action pursuant to the Americans with

Disabilities Act ("ADA") and the New York State Human Rights Law ("NYHRL").

Specifically, Plaintiff alleged discrimination and retaliation in violation of the ADA and the

NYHRL.[1]

Currently before the Court is Defendant's[2] motion for summary judgment.


## II. BACKGROUND[3]

Defendant Petr-All is a New York corporation that operates Defendant Express Mart gas stations and convenience stores throughout Central New York. Defendant first employed Plaintiff in June 2000 as a store manager for Defendant's Store #360. While employed, Plaintiff reported directly to the area supervisor for the geographic area in which the store was located, Area 6. When Plaintiff began, the Area 6 supervisor was Kevin Connelly. Later George Tartick and then Steve Nucci were Area 6 supervisors. The area supervisors, in turn, reported to the Director of Marketing. For most of Plaintiff's tenure, the Director of Marketing was Kevin Quinton. At the time of Plaintiff's termination, the Director of Marketing was Chris Sweeney.

When she was hired, Plaintiff was provided an Employee Hire Package. The Package included Defendant's Policies Regarding Security and Personal Conduct, which, among other things, stated that "anyone that commits violations of these rules may be subjected to termination of employment . . ." and that one such rule was the "[r]efusal to comply with the instructions of management." Plaintiff signed a document acknowledging that she had received and reviewed

---

[1] Although not specifically pled, Defendants believe that Plaintiff is also attempting to allege a harassment/hostile work environment claim and failure-to-accommodate claim. As such, the Court will address these additional claims as well.

[2] Unless otherwise noted, the Court will refer to Defendant Petr-All Petroleum Corporation, Defendant Express Mart, and Defendant Petr-All Petroleum Consulting Corporation as "Defendant."

[3] Unless otherwise noted, the parties do not dispute the "Background" facts.

these policies.

Plaintiff also received a job description.  As a store manager, Plaintiff was responsible for scheduling employees, covering missed shifts, making coffee, sweeping, stocking coolers, waiting on customers, making pizzas, and entering paperwork.  She was also responsible for hiring employees and conducting employee reviews.  Plaintiff typically worked six days a week. In 2006, Plaintiff received a handbook from Defendant Petr-All.  The handbook contains, among other things, a policy regarding job descriptions and reasonable accommodations.

Plaintiff's employment with Defendant Petr-All was unremarkable until November 2006. At that time, Plaintiff, while intoxicated, made phone calls to both Chris Sweeney and Kevin Quinton, then Director of Marketing.  *See* Deposition Transcript of Steven Nucci dated August 18, 2009 ("Nucci Tr."), at 175; Deposition Transcript of Susan Guinup dated May 27, 2009 ("Guinup Tr."), at 66-69, 77; Deposition Transcript of Christopher Sweeney dated December 22, 2009 ("Sweeney Tr."), at 54.  The phone calls contained several "F-bombs" and other inappropriate language.  *See* Sweeney Tr. at 54.  Mr. Nucci, who was Plaintiff's supervisor at the time, investigated the incident and considered terminating Plaintiff.  However, he felt that the fact that Plaintiff had been under the influence of alcohol at the time and Plaintiff's later remorse mitigated against termination.  *See* Nucci Tr. at 182.  Consequently, Mr. Nucci decided to give Plaintiff a final written warning and a one-week suspension.  The final written warning indicated that Plaintiff had violated "Rule #5"[4] and stated that, "[i]f Sue violates this rule or any other policy, she will be dismissed and terminated from our employment."  *See* Guinup Tr. at 79;

_____

[4] Rule No. 5 of Defendant's Policies prohibits "[r]eporting to work under the influence of alcohol or drugs, or consuming intoxicants on company premises."  *See* Dkt. No. 19-2 at 3 n.3.

Affidavit of Leslie Prechtl Guy sworn to March 1, 2010 ("Guy Aff."), at Exhibit "E."

In March 2007, Plaintiff injured her shoulder, and her physician placed her on light duty. Defendant accommodated Plaintiff's need for light duty for three weeks.

For the six years prior to April 2007, Mr. Nucci consistently graded Plaintiff as meeting or exceeding all of management's job performance criteria and expectations.  *See* Nucci Tr. at 194-95; Guinup Tr. at 64-65.  Comparative sales at Plaintiff's store ranked in the upper half; store inspections, inventory/cash controls, and payroll budget compliance consistently met or exceeded expectations.  *See* Nucci Tr. at 195.  As a result, in seven years, Plaintiff only missed receiving a quarterly Manager's Incentive Bonus, based on multiple factors, including productivity, sales, growth, profits, and expenses, two to four out of twenty-eight times.  *See* Nucci Tr. at 102; Declaration of Susan Guinup dated April 26, 2010 ("Guinup Decl."), at ¶ 5.

As part of her job duties, Plaintiff was required to create a weekly work schedule for her employees.  To do this, Plaintiff was required to use the authorized payroll budget  that told managers how many hours they were allowed to use for payroll each week.  In creating the payroll budget, the area supervisor would submit a proposed payroll budget which, if necessary, the Director of Marketing would review.  The payroll budget changed as needed in order to make certain that payroll was consistent with the store's need.  Factors considered in creating the payroll budget for a particular store included the store's sales, the delivery schedule for products, and coverage issues.

In April 2007, Mr. Nucci reduced the payroll budget for Plaintiff's store by thirteen hours from 353 to 340 hours per week.  Mr. Nucci testified that he did this in part because rising fuel costs were reducing store profit margins and because Plaintiff's store's sales had decreased.  *See*

Nucci Tr. at 137, 144.  Mr. Nucci also reduced payroll budgets for other stores within his area.

*See id.* at 137.  The net result of this reduction was that, in her capacity as store manager,

Plaintiff would be working a minimum of sixty to sixty-five hours per week because she was

required to work all store hours not covered by the reduced budget.  *See* Guinup Decl. at ¶ 8.

　　　　For the six years prior to April 2007, during which Plaintiff worked under Mr. Nucci's

direction and control, although the payroll budget was stated in terms of hours on a weekly basis,

as long as the store manager's total payroll budget for the quarter (13 weeks) was not exceeded,

Mr. Nucci considered store managers, including Plaintiff, to be in budgetary compliance.  *See*

Nucci Tr. at 122.  Mr. Nucci had discretion to modify Plaintiff's store's payroll budget without

further management approval and had, on occasion, increased the budget based on Plaintiff's

recommendations and/or report of conditions at the store.  *See id.* at 129, 133.

　　　　Plaintiff communicated her concerns to Mr. Nucci, both verbally and in writing,

requesting clarification as to the reasons for this payroll budget reduction.  *See* Nucci Tr. at 140;

Guinup Tr. at 91.  Plaintiff urged that the new payroll budget was too low because the store's

busy season was starting and business was brisk; she had lost two of her key night people from

the previous year; when she was off-duty for medical treatment, it took more manpower to fill

her duties; and, due to work related injuries she had sustained, she was supposed to be on light

duty for a period of time.  *See* Guinup Decl. at ¶ 9; Guinup Tr. at 123-24; Affirmation of Shelly

A. Leonard dated April 26, 2010 ("Leonard Aff."), at Exhibit "J".  In an email dated April 3,

2007, Plaintiff stated that

> there is no way I can operate this store on 340 hours from [A]pril
> through [S]ept.  [I] need approximately 370 hours per week.  My
> body is already beat to heck from the physical work at this location
> and I'm supposed to be on light duty.  [I] have always monitored

my payroll here according to the sales and make adjustments for lower sales.  [I] have 360 hours scheduled for this week.  w/e 4/7/07 and will have 350 hours for the following week, and you will start to see that increase as the weather gets better and the camps open up.  [O]ur store sells a lot of grocery items and putting away stock is a full time job when business picks up.

I do not know what you can do with [this] info, but I hope something.

*See* Leonard Aff. at Exhibit "C."  In response to Plaintiff's request, Mr. Nucci replied that he would try to get her hours slightly increased and that he had to get approval in order to increase the scheduled hours.  *See* Guy Aff. at Exhibit "F."  Mr. Nucci never communicated in writing to Plaintiff the status of her request.  *See* Nucci Dep. at 240.  Mr. Nucci also warned Plaintiff after she made several requests for payroll budget increases that any manager who failed to abide by the new payroll budgets would be given "a written counseling."  *See id.*  Mr. Nucci never communicated to Plaintiff that she would be terminated if she failed to follow the new payroll budget.  *See id.* at 209.  Plaintiff scheduled her store for more than 340 hours for each week after this directive was issued.

On May 29, 2007, Plaintiff consulted a physician who placed her on job restriction wherein she would be out of work for six to eight weeks because of, among other things, lupus.  On the same day, Plaintiff communicated this information to Mr. Nucci and sent the physician's note to Defendant's Human Resources Department.  Six days after she communicated this information to Defendant, on June 4, 2007, Defendant terminated her.  Defendant did not provide a formal written reason for the termination.  It was not until Plaintiff commenced this action that, during depositions, Defendant attributed Plaintiff's termination to her purported "insubordination."  *See id.* at 272.

### III. DISCUSSION

**A.      Plaintiff's discrimination claim[5]**

Title I of the ADA prohibits an employer from discriminating against a qualified

individual with a disability in the terms, conditions, and privileges of employment.  *See* 42

U.S.C. § 12112(a).  "A plaintiff alleging employment discrimination under the ADA bears the

initial burden of establishing a prima facie case."  *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867,

869 (2d Cir. 1998) (citation omitted).

> In order to establish a prima facie case of discriminatory discharge,
> a plaintiff must show that: (1) her employer is subject to the ADA;
> (2) she suffers from a disability within the meaning of the ADA;
> (3) she could perform the essential functions of her job with or
> without reasonable accommodation; and (4) she was fired because
> of her disability.

*Id.* at 869-70 (citations omitted).

If a plaintiff is successful in making out a *prima facie* case, then the burden shifts to the

defendant, "who must proffer a legitimate, non-discriminatory reason for its actions in order to

rebut the presumption of unlawful discrimination."  *Greenway v. Buffalo Hilton Hotel*, 143 F.3d

47, 52 (2d Cir. 1998) (citation omitted).  If the defendant meets its burden, the plaintiff must then

show that the "proffered explanation is merely a pretext for its intentional discrimination."  *Id.*

(citations omitted).  At the summary judgment stage, a plaintiff "need only establish a *prima*

*facie* case by producing evidence sufficient to support a reasonable inference of discrimination."

*Kotlowski v. Eastman Kodak Co.*, 922 F. Supp. 790, 796 (W.D.N.Y. 1996) (citation omitted).

---

[5] "A claim of disability discrimination under the New York State Human Rights Law,
N.Y. Exec. Law §§ 290-301 (McKinney 2005), is governed by the same legal standards as
govern federal ADA claims."  *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir.
2006) (citation omitted).

### *1. Qualified individual with a disability*

Defendant asserts that Plaintiff's ADA and NYHRL discriminatory termination claims

fails because Plaintiff could not perform the essential functions of her job with or without an

accommodation. *See* Dkt. No. 19-2 at 15.  Defendant claims that Plaintiff has been on a no-work

restriction since May 29, 2007, and that, in her Social Security Disability Benefits application,

Plaintiff admitted that she could no longer meet the physical demands of her former job and

included great detail regarding the specific functions she could no longer perform.  *See id.* at 15-

16.

Once a plaintiff demonstrates that she was disabled at the time of the adverse

employment action and that the employer was subject to the ADA and on notice of her disability,

a court must inquire whether the plaintiff has established that she is a "'qualified individual with

a disability[.]'"  *Simmons v. N.Y.C. Transit Auth.*, 340 Fed. Appx. 24, 26 (2d Cir. 2009)

(quotation omitted).  As such, the plaintiff must make a sufficient showing that, with reasonable

accommodation, she could perform the essential functions of the relevant job and that the

employer failed to make the appropriate accommodations.  *See id.* (quotation omitted).  "The

determination as to whether an individual is a 'qualified individual with a disability' must be

made as of the time of the employment decision."  *Nowak v. St. Rita High Sch.*, 142 F.3d 999,

1003 (7th Cir. 1998) (quotation omitted); *Henzel v. Delaware Otsego Corp.*, 285 F. Supp. 2d

271, 277 n.8 (N.D.N.Y. 2003) (citation omitted).

As discussed, Plaintiff's physician took her out of work on May 29, 2007.  *See* Dkt. No.

19-12 at 4.  Moreover, at her deposition, Plaintiff stated that she had not applied for any position

similar to that of a store manager since the date of her termination because "I have work

restrictions where I wouldn't be able to do the physical demands of the – that job."  *See* Guinup

Tr. at 33.

In June 2007, Plaintiff also applied for Social Security Disability benefits.  In her

application for benefits, Plaintiff stated that she could not "move or [do] hardly any of my job

duties, even data entry was painful to do at times.  Also [c]an't . . . be on my feet, lift, stock

shelves, get change, run register, make coffee, wash dishes, stand in one spot for long, sit for

more than 15 min., banking, filing, ATM."  *See* Dkt. No. 19-12 at 4.  Additionally, Plaintiff

attached Defendant's job description to her Social Security Disability benefits application and

indicated which of the job's "Responsibilities" and "Requirements" she could no longer perform.

*See* Dkt. No. 19-13 at 28-29.  The following constitute Defendant's responsibilities for its store

managers, with Plaintiff's proclaimed limitations included in bold font:

> Ensure that each customer receives outstanding service by
> providing a customer friendly environment which includes
> greeting and acknowledging every customer, maintaining company
> standards, solid product knowledge and all other components of
> customer service.  **Walking/moving quickly causes extreme
> back/leg pain, fatigue[ ] from Lupus makes me unable to be
> "friendly + observant."**
>
> Analyze and measure business trends, develop and implement
> plans to maximize sales and meet or exceed goals and objectives.
>
> Recruit, train and develop store personnel in all aspects of the
> business, direct and monitor training and development [f]or all
> store personnel.  Continually evaluate and react to performance
> issues.  **Due to fatigue and inflamation in various joint[s],
> unable to properly train as it requires full alertness and ability
> to stand in one spot with trainee.**
>
> Ensure all employees are trained using the prescribed materials,
> tools and processes as well as encourage staff to develop additional
> skills.  **Due to fatigue and inflamation in various joint[s],
> unable to properly train as it requires full alertness and ability**

-9-

**to stand in one spot with trainee.**

Communicates with store staff regarding new item information, processes and other information related to the store.

Practice and implement all safe and clean initiatives.  **Sweeping and mopping aggravates left shoulder, back, legs.**

Complete daily and monthly paperwork and computer requirements in order to ensure compliance with company standards and protection of its assets.  **Inflamation in wrists/elbows makes me have pain so severe I can't use the keyboard.**

Responsible for appearance, sanitation, credit card and check cashing procedures, night checks, promotions, etc.  **Cannot climb on ladder to put up sales signs due to knee pain.**

* * * * * * * * *

Stay abreast of competitive marketing conditions/trends and advise supervisor through oral and written reports, i.e. competitor surveys and competitor benchmarking to ensure achievement of Petr-All marketing policies.  **Inflamation in wrists/elbows makes me have pain so severe I can't use the keyboard.**

Handle customer complaints fast and effectively to ensure that we provide all of our customers with the best buying experience.  **Due to fatigue and joint inflamation, can take me much longer to do duty.  1hr job takes 2-3hrs.**

* * * * * * * * *

Ensure that the store image is consistent with the company's standards and reputation for cleanliness.  **Cleaning windows, floors, counters causes pain [in] knees, back, shoulder, wrists.**

Maintenance: Provide routine preventative maintenance to keep all equipment operating at maximum efficiency.  **I can't climb a ladder, reach overhead or get onto knees to do [these tasks].**

Ensure that all pricing procedures and guidelines are correct as listed in the pricebooks for all merchandise.  **When right wrist + elbow is inflamed I can't use pricegun.**

* * * * * * * * *

*See id.*  Moreover, in her application for New York Disability Insurance, which she made in July

2007, Plaintiff asserted that

> "my injuries and illness have caused me to be unable to perform
> requirements of my work such as standing in one spot for long;
> walking, lift, carry cases of milk, water, stock shelves, work in
> cold, lift more than 25 pounds, bending, squatting, climb a ladder,
> sweep, mop, shovel.  Also my joints will swell, when my hands,
> wrists, elbows are involved I cannot use the cash register, raise
> arms to get cigs, scan items, write, type or pick up even light
> weight items.  I have chronic pain and fatigue."

*See* Guinup Decl. at ¶ 14 (quotation omitted).  Defendant asserts that, in light of these

statements, judicial estoppel bars Plaintiff's discrimination claim.

"The doctrine of judicial estoppel prevents a party from asserting a factual position in one

legal proceeding that is contrary to a position that it successfully advanced in another

proceeding."  *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)

(citation omitted).  "Thus, '[a] party invoking judicial estoppel must show that (1) the party

against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2)

that position was adopted by the first tribunal in some manner, such as by rendering a favorable

judgment.'"  *Id.* (quotation omitted).  The Second Circuit recently affirmed that "[j]udicial

estoppel applies to sworn statements made to administrative agencies such as the Social Security

Administration as well as to courts."  *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir.

2010) (citation omitted).

The Supreme Court in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999),

explained the relevant considerations for a court facing potentially inconsistent statements as

-11-

follows:

> When faced with a plaintiff's previous sworn statement asserting
> "total disability" or the like, the court should require an
> explanation of any apparent inconsistency with the necessary
> elements of an ADA claim.  To defeat summary judgment, that
> explanation must be sufficient to warrant a reasonable juror's
> concluding that, assuming the truth of, or the plaintiff's good-faith
> belief in, the earlier statement, the plaintiff could nonetheless
> "perform the essential functions" of her job, with or without
> "reasonable accommodation."

*Id.* at 807.  As such, "when an individual's prior submission regarding his disability to an

adjudicatory body contains a 'purely factual statement[ ] that directly contradict[s]' a statement

made in a subsequent ADA claim, and the two '[can]not be reconciled with any amount of

explanation,' judicial estoppel will preclude the ADA claim."  *Rodal*, 369 F.3d at 118 (quotation

omitted).

Plaintiff has received Social Security Disability benefits effective June 2007 to the

present.  *See* Dkt. No. 25 at ¶ 84.  Plaintiff's sworn statements in her application for Social

Security Disability benefits make clear that, as of May 29, 2007, she was unable to perform

nearly all of the "Responsibilities" and "Requirements" of her job as store manager.  Despite

ample opportunity to do so, Plaintiff has not come forward with an explanation for the

inconsistency between the statements in her Social Security Disability benefits application and

her claim in this case that she was qualified to perform the essential functions of her job, with or

without reasonable accommodation.

Plaintiff relies on *Parker v. Columbia Pictures Indus.*, 204 F.3d 326 (2d Cir. 2000), to

argue that judicial estoppel is inappropriate in the present matter.  In *Parker*, the plaintiff, in his

long-term disability benefits application, indicated that he could not work because he was

"'completely incapacitated – disabled – treatment daily.'"  *Id.* at 334 (quotation omitted).

Thereafter, in his Social Security Disability benefits application, he stated that he "'ha[d]

problems sitting standing and walking for sustained period; [had] constant pain . . . [and]

problems in legs." *Id.* (quotation omitted).  The plaintiff further stated that he "'became unable to

work' on March 16, 1995, and that he was 'still disabled.'"  *Id.* (quotation omitted).  The Second

Circuit held that judicial estoppel was inapplicable in this situation because a reasonable juror

could find that the plaintiff was capable of performing the essential functions of his job with a

reasonable accommodation or on a part-time basis, despite this facial conflict.  *See id.*  The court

also noted that the plaintiff provided reasonable explanations for this facial conflict and that his

description of himself as "'completely incapacitated – disabled'" did not indicate whether he was

capable of performing the essential functions of his job with a reasonable accommodation.  *See

id.* at 335.

Here, unlike *Parker*, Plaintiff made more than mere conclusory statements that she was

"disabled" or that she simply had trouble standing, was in constant pain, or that she could not sit

for prolonged periods of time.  Although the application for Social Security Disability benefits is

unconcerned with a person's ability to perform his job with "'reasonable workplace

accommodations,'" *see id.* at 334 (quotation omitted), Plaintiff's application made clear that,

regardless of the accommodation offered, she would still not be able to perform the essential

functions of her job.  As discussed above, Plaintiff included as part of her Social Security

Disability benefits application Defendant's job responsibilities and requirements for the store

manager position.  Plaintiff clearly indicated that, as of May 29, 2007, she was incapable of

performing nearly all of the material aspects of her job.  Moreover, Plaintiff has failed to submit

evidence that her physician ever cleared her to return to work.  Despite this failure, Plaintiff claims that, "[a]fter my 6-8 week medical hiatus, I was capable of returning as a manager at store #360 on a reduced hour basis or with accommodation on a full time basis."  *See* Guinup Decl. at ¶ 16.

Also telling is that Plaintiff had not filled out a single job application from the time she left Defendant's employ to the date of her deposition.  *See* Guinup Tr. at 16.  She stated that she had not filled out any job applications because she had "been on restrictions for any type of physical work since May of 2007."  *See id.* at 18.  Plaintiff then admitted that she had been on "full restriction," prohibiting her from working at all, since her back surgery on March 17, 2008, and that she was on full restriction starting May 29, 2007, but could not recall if her physician ever lifted that restriction before her back surgery.  *See id.* at 23-24.  She believed that she might have been "given a partial restriction for a brief time."  *See id.* at 24.  In fact, Plaintiff admitted that both Dr. Haher and Dr. Arango had her on restriction from work and admitted that Dr. Arango had never released her to return to work.  *See id.* at 143-45.  Plaintiff's medical records do not support her assertion that she was ever released to return to work.  *See Henzel*, 285 F. Supp. 2d at 276 (holding that "[i]t is axiomatic that an individual cannot perform the essential functions of a job if he is completely unable to work regardless of accommodation" (collecting cases)).

Although Plaintiff states in her declaration that, "[a]fter my 6-8 week medical hiatus, I was capable of returning as a manager at store #360 on a reduced hour basis or with accommodation, on a full time basis[,]" the record fails to support this allegation.  *See* Guinup Decl. at ¶ 16.  Despite ample opportunity to do so, Plaintiff fails to contradict the statements that

-14-

she made in her applications for Social Security Disability benefits and long-term disability

benefits; and, in fact, her deposition statements further support the conclusion that she was

incapable of performing the essential functions of her job as of the date of her termination

through the present.  *See Micari v. Trans World Airlines, Inc.*, 43 F. Supp. 2d 275, 281

(E.D.N.Y. 1999) (holding that, "[a]lthough 'reasonable accommodation' may include

modifications to the work schedules and alterations of the assignments and/or physical

equipment, '"reasonable accommodation" does not mean elimination of any of the job's essential

functions'" (quotation and other citation omitted)).

Based on the foregoing, the Court finds that judicial estoppel prevents Plaintiff from now

asserting that she was capable of performing the essential functions of her job as of May 29,

2007, through the present.  As such, the Court grants this part of Defendant's motion for

summary judgment and dismisses Plaintiff's ADA and NYHRL discrimination claims.  *See

Giaquinto v. N.Y. Tel. Co.*, 135 A.D.2d 928, 929 (3d Dep't 1987) (holding that, under the

NYHRL, "if the individual's disability actually prevents him from performing his job in a

reasonable manner, then discharge from employment because of his poor work performance does

not constitute unlawful discrimination" (citations omitted)).


**B.      Failure to accommodate**

To establish a *prima facie* case of discrimination because of disability premised on an

employer's failure to accommodate, a plaintiff must show: "'(1) that [s]he is an individual who

has a disability within the meaning of the [ADA], (2) that an employer covered by the statute had

notice of h[er] disability, (3) that with reasonable accommodation, [s]he could perform the essential functions of [her position], and (4) that the employer has refused to make such accommodations.'" *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 216 (2d Cir. 2001) (quoting *Stone v. City of Mt. Vernon*, 118 F.3d 92, 96-97 (2d Cir. 1997)).

        As discussed above, Plaintiff failed to establish that she was able to perform the essential functions of her position, with or without a reasonable accommodation.  Said another way, no accommodation existed that would have allowed Plaintiff to perform the essential functions of her job.  As such, the Court holds that Plaintiff has failed to set forth a *prima facie* case of failure to accommodate; and, therefore, dismisses Plaintiff's failure to accommodate claim.  *See Henzel*, 285 F. Supp. 2d at 276-77 (collecting cases); *see also Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 8 (2d Cir. 1999).


**C.      Retaliation under the ADA**

        The ADA makes it unlawful for an employer "to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter."  42 U.S.C. § 12203(b).  The ADA further renders it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

            To defeat a motion for summary judgment addressed to a claim of
            retaliation under the ADA, a plaintiff must first present sufficient
            evidence to make out a *prima facie* case – that is, evidence
            sufficient to permit a rational trier of fact to find [as follows]: (1)

-16-

> that he engaged in protected participation or opposition under the
> ADA; (2) that the employer was aware of this activity; (3) that the
> employer took adverse action against the plaintiff; and (4) that a
> causal connection exists between the protected activity and the
> adverse action, *i.e.*, that a retaliatory motive played a part in the
> adverse employment action.

*Valtchev v. City of N.Y.*, No. 06 Civ. 7157, 2009 WL 2850689, *6 (S.D.N.Y. Aug. 31, 2009)

(citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)).  If the

plaintiff meets her *prima facie* burden, the defendant may rebut this by "point[ing] to evidence of

a legitimate, nonretaliatory reason for the challenged employment decision[.]"  *Id.* (citing *Cifra*

*v. G.E. Co.*, 252 F.3d 205, 216 (2d[ ] Cir. 2001)).  If the defendant meets this burden, "the

plaintiff must point to evidence that would be sufficient to permit a rational factfinder to

conclude that the employer's explanation is merely a pretext for impermissible retaliation."  *Id.*

(citation omitted).

Protected activity includes the making of a charge, testifying, assisting or participating in

any manner in an investigation, proceeding or hearing pursuant to the ADA.  *See* 42 U.S.C.

§ 12203(a).  Requesting reasonable accommodations for a disability may also constitute

protected activity.  *See Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 149 (2d Cir. 2002)

(discussing that a retaliation claim may be based on a request for reasonable accommodation

(citation omitted)); *Jenkins v. N.Y.C. Transit Auth.*, 646 F. Supp. 2d 464, 473 (S.D.N.Y. 2009)

(citations omitted).

Here, Plaintiff asserts that

> [D]efendants' retaliatory conduct included, but was not limited to,
> decreasing Plaintiff's store's Payroll Budget Hours which then
> required Plaintiff to work extra hours.  Said payroll budget cuts
> also made it difficult for Plaintiff to attend doctor's appointments.
> To attend her medical appointments, Plaintiff would have to obtain

> coverage, which would increase the payroll budget.  The
> detrimental effects that these inflexible payroll budget quotas were
> having on Plaintiff's disabilities were directly communicated to
> management, which failed to accommodate Plaintiff's disability.

*See* Dkt. No. 22 at 23.  Thereafter, Plaintiff claims that she first complained about the lack of

accommodation in April of 2007, that her healthcare provider directed her to stop working on

May 29, 2007, and that Defendant then terminated her on June 4, 2007.  *See id.* at 23-24.

Plaintiff attempts to assert that she was retaliated against for requesting an increase in her store's

payroll budget hours, which is shown by the fact that "no other store manager was ever

disciplined or terminated as a result of exceeding his/her stores' Payroll Budget Hours."  *See*

*id.* (citing Sweeney Dep. 94-107; Exhibit "G").

First, Plaintiff may not claim that her emails to Mr. Nucci constituted protected activity

and that the decrease in payroll budget hours, which occurred prior to the emails, was retaliation

for the same emails.  It is axiomatic that Defendant could not have retaliated against Plaintiff for

conduct in which she had not yet engaged.

Second, to the extent that Plaintiff asserts that Defendant retaliated against her for taking

medical leave on May 29, 2007, Defendant has put forth a legitimate, non-discriminatory reason

for discharging her, *i.e.*, insubordination.  In April 2007, Mr. Nucci emailed Plaintiff, along with

other store managers in his coverage area, stating that payroll budget hours were going to be

reduced at many store locations.  *See* Dkt. No. 19-9 at 5.  Mr. Nucci further provided that no

overtime would be permitted, that store managers "may not go above [the] budgeted payroll

hours that you have been given[,]" and that, if an employee "calls in," the store manager may

have to be the person who works during that time slot so that overtime payments do not occur.

*See id.*

Soon thereafter, Plaintiff emailed Mr. Nucci to inform him that she did not believe that she could operate her store on 340 hours from April to September; and, in fact, she claimed that she would need approximately 370 hours from April through September.  *See* Dkt. No. 19-9 at 6. Plaintiff informed Mr. Nucci that "my body is already beat to heck from the physical work at this location, and I am supposed to temporarily be on light duty."  *See id.*  On April 27, 2007, Mr. Nucci again emailed store managers that they were not permitted to go over their scheduled payroll budget, and he further advised that their failure to abide by this new rule would result in the manager being "document[ed]," which he was already forced to do.  *See id.* at 8-9.  Mr. Nucci sent another email to all area store managers at the end of April, expressing the same policy concerns.  *See id.* at 10.

On May 5, 2007, Plaintiff again requested an increase in her store's payroll budget hours, which Defendant denied.  *See id.* at 7; Guinup Tr. at 92-93.  Again, Plaintiff wrote to Mr. Nucci for clarification; and Mr. Nucci responded, again, that a written counseling would be given to any manager who failed to follow these new guidelines.  *See* Dkt. No. 19-9 at 11-12.  Also, in response to Plaintiff's concerns, Mr. Nucci wrote to Plaintiff and told her to email him what she believed to be her payroll budget requirements and informed her that he would "try to get your hours increased a bit.  The increase has to be approved, no other way."  *See id.* at 13.

Despite being instructed that she was to use no more than 340 hours per week, on May 6, 2007, Plaintiff sent Mr. Nucci an email indicating that she had scheduled her store for 348 hours. *See id.* at 15.  Mr. Nucci responded that she was required to reduce her hours to 340.  *See id.* at 14.  The following week, Plaintiff again emailed Mr. Nucci and indicated that she had scheduled her store for 351 hours, to which Mr. Nucci responded that she must reduce her hours to 340.

-19-

*See id.* at 16-17.  On or about May 21, 2007, Mr. Nucci again asked Plaintiff to comply with her

budgeted hours.  *See id.* at 20; Guinup Tr. at 118.  Then, on Friday, May 25, Mr. Nucci inquired

if Plaintiff had scheduled more than 340 hours, to which Plaintiff indicated that she had.  *See*

Dkt. No. 19-9 at 18-19.  Finally, on May 29, 2007, Plaintiff emailed Mr. Nucci indicating that

she had scheduled her store for 359.38 hours for the week ending on May 26 and for 350 hours

for the following week.  *See id.* at 21; Guinup Tr. at 119-20.

Clearly, Plaintiff's conduct constituted insubordination.  She repeatedly ignored the

demands of her superiors; and, despite her claims, Plaintiff failed to make clear that she had

increased her budgeted payroll hours because she needed an accommodation.  Only once did she

mention that her "body is already beat to heck from the physical work at this location, and I am

supposed to temporarily be on light duty."  *See* Dkt. No. 19-9 at 6.  Although Plaintiff contends

that this conduct was her request(s) for reasonable accommodation, Defendant reasonably

believed that this conduct was insubordination; and Plaintiff's isolated comment regarding her

body being "beat to heck" cannot be construed as a request for an accommodation.

Nonetheless, despite the fact that Defendant has come forward with a legitimate, non-

discriminatory reason to discharge Plaintiff, an issue of fact exists regarding whether this reason

was merely pretextual.  Although Plaintiff's comment that her body was "beat to heck" did not

constitute a request for a reasonable accommodation and, therefore, a protected activity, taking

medical leave is a protected activity within the meaning of the ADA.  *See Henzel*, 285 F. Supp.

2d at 278.  On the Tuesday following Plaintiff's May 29, 2007 email – the Tuesday after

Memorial Day – Mr. Nucci called Plaintiff to schedule a meeting with her for the next day;

Plaintiff, however, indicated that she had a doctor's appointment that day and would have to

reschedule.  *See* Guinup Tr. at 121-22.  This meeting never occurred, however, because Plaintiff's doctor placed her on a work restriction from that day forward.  Defendant terminated Plaintiff several days after she requested medical leave.

Although the Court has doubts about Plaintiff's ability to prove this claim at trial, the fact that her termination came just days after she informed Defendant that she would be required to take six to eight weeks medical leave creates an issue of fact precluding summary judgment.  *See Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (holding that "[t]he causal connection needed for proof of a retaliation claim '"can be established indirectly by showing that the protected activity was closely followed in time by the adverse action"'" (quotation omitted)).

Based on the foregoing, the Court denies Defendant's motion for summary judgment on Plaintiff's retaliation claim.


**D.      Hostile work environment under the ADA**

Plaintiff alleges that she was subjected to a hostile work environment.  Courts analyze hostile work environment claims under the ADA and the NYHRL using the same standard that they apply to Title VII hostile work environment claims.  *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (NYHRL) (citations omitted); *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008) (ADA) (footnote omitted).[6]

To establish a *prima facie* case of hostile work environment, the plaintiff must show that

---

[6] Although the Second Circuit "has not expressly held that the ADA authorizes claims for hostile work environment, district courts have found that the ADA encompasses hostile work environment claims."  *Monterroso*, 591 F. Supp. 2d at 584 (footnote omitted).

she "1) is a member of a protected class; 2) that she suffered unwelcome harassment; 3) that she was harassed because of her membership in a protected class; and 4) that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." *Monterroso*, 591 F. Supp. 2d at 584 (footnote omitted).  The standard is a "'demanding one,'" and the alleged harassment must be sufficiently "'offensive, pervasive, and continuous enough' to create an abusive working environment."  *Id.* at 584-85 (footnote omitted). To determine whether conduct rises to such a level, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Robins v. N.Y.C. Bd. of Educ.*, No. 07 Civ. 3599, 2010 WL 2507047, *11 (S.D.N.Y. June 21, 2010) (citing *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)) (other citation omitted).  "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some objective level of hostility." *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001) (citations omitted).

The few facts that Plaintiff provides in her complaint and other filings to support this claim fall far short of establishing a hostile work environment.  Her evidence consists of a comment that either Ms. Cavallo or an outside insurance agent made at a health insurance meeting discussing the fact that rates would be going down because certain claims would no longer be covered.  *See* Guinup Tr. at 130.  Moreover, she also makes a conclusory allegation that, in 2004, Defendant terminated her co-manager and another employee after they took medical leaves for injuries.  *See id.* at 134-35.  Plaintiff admitted, however, that she had no direct

knowledge regarding what happened to those employees. *See id.*

Based on the foregoing, the Court finds that Plaintiff has failed to present evidence that would lead a reasonable person to believe that Defendant created a hostile work environment. Therefore, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's hostile work environment claim.[7]

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part and DENIED in part**;[8] and the Court further

**ORDERS** that Plaintiff's counsel shall initiate a telephone conference, using a professional conferencing service, with the Court and opposing counsel on **April 12, 2011**, at **9:30 a.m.**, to set a trial date for this action.

---

[7] The Court also notes that, although Point IV of her response to Defendant's motion for summary judgment is labeled as a hostile work environment claim and discusses the fact that district courts within the Second Circuit, as well as other Courts of Appeal, have recognized hostile work environment claims under the ADA, Plaintiff, thereafter, recites the applicable standard for a retaliation cause of action and fails to discuss the merits of her hostile-work environment claim. *See* Dkt. No. 22 at 21-24. As such, the Court, alternatively, concludes that Plaintiff has abandoned her hostile work environment cause of action and grants Defendant's motion for summary judgment on that basis as well. *See Lipton v. Cnty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) (holding that, "[t]his Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed" (citing cases)).

[8] As a result of this Memorandum-Decision and Order, the only claim that remains is Plaintiff's ADA and NYHRL retaliation claim.

**IT IS SO ORDERED.**

Dated: March 30, 2011
        Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge